No. 24-3894

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

ALICIA NOLEN,

Plaintiff-Appellee,

v.

PEOPLECONNECT, INC.,

Defendant-Appellant.

---

On Appeal from December 14, 2023 Sealed Order
and May 20, 2024 Order Granting Class Certification
United States District Court,
Northern District of California
The Honorable Edward M. Chen
Case No. 3:20-cv-09203-EMC

---

## EXCERPTS OF RECORD VOLUME 1 OF 5

---

Clifford W. Berlow
Debbie L. Berman
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
cberlow@jenner.com
dberman@jenner.com

Ian Heath Gershengorn
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com

*Attorneys for Defendant-Appellant PeopleConnect, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALICIA NOLEN,

           Plaintiff,

      v.

PEOPLECONNECT, INC.,

           Defendant.

Case No.  20-cv-09203-EMC

**ORDER RE STATUS REPORT**

Docket No. 276

Previously, the Court ordered the parties to meet and confer regarding (1) class definition and (2) class notice.  *See* Docket No. 256 (order conditionally granting class certification, filed on 12/14/2023); Docket No. 267 (order re class definition and class notice, filed on 1/19/2024). Following several months of exchanges, the parties have finally submitted a status report.  The parties have reached agreement on some issues, but not others.

## I.     CLASS DEFINITION

Ms. Nolen proposes the following class definition[1]:

> All persons residing in the State of California: (1) who are not, and have never been, registered users of Classmates.com; (2) who have never donated a yearbook to Classmates.com; and (3) for whom a search of their name, using the search bar on the Classmates.com website, yields at least one record corresponding to the class member from a yearbook that Classmates.com first made publicly available on or after December 18, 2018.

Status Rpt. at 3.  The parties have three disputes related to this proposed definition.

---

[1] The Court has modified the proposed definition to address grammatical issues.

1-ER-2

A.    Element (3)

PeopleConnect takes issue with the third element in the proposed definition, asserting that it suffers from both vagueness and overbreadth problems.  According to PeopleConnect, the third element is vague because "the only way to determine who is 'searchable,' and therefore is a member of a class, is to undergo a burdensome, individualized manual process for all class members"; and the third element is overbroad because it "include[s] individuals who do not have meritorious claims" – *i.e.*, because they are not reasonably identifiable.  Status Rpt. at 4.

Neither argument is persuasive.  As to vagueness, PeopleConnect has not explained why class members could not self-identify.  The Court's class-certification order addressed self-identification, albeit in a slightly different context (*i.e.*, a class member representing that she is not a registered user, as registered users are excluded from the class).  *See* Docket No. 256 (Order at 30-32).  Any concern about fraudulent self-identification is also tempered here because the legitimacy of a self-identification can easily be tested; this is not a situation where, *e.g.*, a consumer may not have kept a receipt showing that she purchased a product.

As for overbreadth, the Court previously rejected (in its class certification order) PeopleConnect's contention that reasonable identifiability could not be determined without overwhelming individualized inquiries.  PeopleConnect is essentially asking the Court to reconsider without having filed a motion for leave to file a motion for reconsideration as required by the District's Local Rules.  *See* Civ. L.R. 7-9.

Even if PeopleConnect had so moved and the Court given leave to file a motion to reconsider, PeopleConnect would not obtain a more favorable result.  As the Court noted in its class certification order, "a person is usually identifiable by their name, especially when viewed in context of having attended a particular school in a particular year."  Docket No. 256 (Order at 21).  PeopleConnect has still failed to show that the problem of, *e.g.*, a same or similar name "is . . . extensive or pervasive . . . , especially when the confusion must occur within the same school within a given year."  Docket No. 256 (Order at 25).  In the absence of a such problem, any confusion of identity can be worked out without having individualized inquiries overwhelm common ones.  *See Van v. LLR, Inc.*, 61 F.4th 1053, 1069 (9th Cir. 2023) (stating that, "[w]hen a

2

United States District Court
Northern District of California

United States District Court
Northern District of California

1   defendant substantiates . . . an individualized issue . . . , the district court must determine . . .

2   whether a class-by-class-member assessment of the individualized issue will be unnecessary or

3   workable").  For example, as Plaintiffs contend, if there are multiple individuals with the same

4   name, other information available in the yearbook can likely be used to distinguish them – or may

5   show that the names all refer to the same person.  *See also* Docket No. 256 (Order at 25) (stating

6   that PeopleConnect "has not demonstrated that any confusion of identity cannot be easily

7   resolved").[2]

8           Moreover, although a person must be reasonably identifiable in order to prevail on a §

9   3344 claim, should that issue present a larger concern, it could be reserved for a later stage in the

10  proceedings, *i.e.*, when damages are to be determined.  "Rule 23 specifically contemplates the

11  need for . . . individualized claim determinations after a finding of liability."  *Briseno v. ConAgra*

12  *Foods, Inc.*, 844 F.3d 1121, 1131 (9th Cir. 2017); *see also* Docket No. 256 (Order at 26 n.12)

13  (noting that Federal Rule of Civil Procedure 23(c)(4) allows for issues to be determined on a

14  classwide basis; "what is before the Court is something akin to a separation of liability and

15  damages issues – *i.e.*, Ms. Nolen will rely on common evidence to show that PeopleConnect used

16  people's names and photos for a commercial purpose; if she is successful, then the only remaining

17  step for a person to claim statutory damages of $750 is to show that their name was readily

18  identifiable").

19

20  [2] In *Van*, there was a more significant problem of individualized inquiries compared to that here.
    The defendant was a company that sold clothing to purchasers through fashion retailers in all fifty
21  states.  It "allegedly charged sales tax to these purchasers based on the location of the retailer,
    rather than the location of the purchaser, which resulted in some online purchasers being charged,
22  and having paid, sales tax when none was owed."  *Van*, 61 F.4th at 1058.  Some retailers,
    however, gave discounts to offset the improper sales tax.  There was evidence that there were
23  13,680 discounts out of 72,373 transactions total, and "at least eighteen of the 13,680 discounts
    provided to class members were provided for the [express] purpose of offsetting the improperly
24  assessed sales tax."  *Id.*; *see also id.* at 1068 n.13.  The Ninth Circuit noted:

25          [The defendant's] evidence, even though it consisted of only a small
            number of invoices, was sufficient to prove that an inquiry into the
26          circumstances and motivations behind *each of the 13,680 discounts*
            might be necessary. This inquiry, which could potentially involve up
27          to *13,680 depositions* and months of trial, certainly cannot be
            described as de minimis.

28  *Id.* at 1069 (emphasis added).

                                                    3

The Court therefore rejects PeopleConnect's challenge to element (3).  That being said, the Court modifies element (3) to provide some additional clarity and, as discussed below, to limit the definition to California yearbooks.  The class definition approved by the Court is as follows (with the modifications highlighted for the convenience of the parties only).

> All persons residing in the State of California: (1) who are not, and have never been, registered users of Classmates.com; (2) who have never donated a yearbook to Classmates.com; and (3) for whom a search of their name, using the search bar to search a California yearbook made available for viewing on the Classmates.com website, yields at least one record corresponding to the class member from a California yearbook that Classmates.com first made publicly available on or after December 18, 2018.

B.     Additional Element re Consent

PeopleConnect argues next that a fourth element should be added to the proposed definition.  Specifically, PeopleConnect points out that elements (1) and (2) are included to acknowledge that a person is *not* a class member if she has consented to use of her name or likeness – *i.e.*, by (1) becoming a registered user or (2) donating a yearbook.  PeopleConnect asserts that there should be a fourth element that acknowledges consent to use in another context, namely, when individuals give consent to use to school districts and yearbook publishers.  *See* Status Rpt. at 8.

The Court rejects PeopleConnect's proposal.  In its class certification order, the Court noted that PeopleConnect offered no "concrete evidence that yearbook publishers were given broad consents to use."  Docket No. 256 (Order at 34).  While PeopleConnect did offer some evidence to support its position that school districts were given broad consents to use, the Court examined that evidence and did not find it compelling.  Most of the consents allowed a "district to use the names or photos for district purposes.  At best, only a few of the forms . . . suggest[ed] that there might be broader consents."  Docket No. 256 (Order at 35).

This ruling does not mean that PeopleConnect cannot argue this kind of consent as a defense on the merits.  However, given the lack of evidence to suggest this is a common kind of consent, it need not be included as part of the class definition.

4

C.      California Yearbooks

Finally, PeopleConnect argues that the proposed definition should be modified –

specifically, element (3) – so that only "California yearbooks" are implicated and not yearbooks

nationwide. *See* Status Rpt. at 10-11 (proposing the following change: "All persons residing in the

State of California . . . for whom a search of their name . . . yields at least one record

corresponding to the class member from a *California* yearbook that Classmates.com first made

publicly available on or after December 18, 2018") (emphasis added).

The Court agrees with PeopleConnect. Plaintiffs' filings led both PeopleConnect and the

Court to believe that Plaintiffs were concerned about California yearbooks only, and the Court's

analysis (*e.g.*, on manageability) was predicated on that understanding. For example, at class

certification, Plaintiffs submitted an expert declaration (the Kupperberg Declaration). Mr.

Kupperberg was asked to opine on, e.g., the estimated size of the class. See Docket No. 141

(Kupperberg Decl. ¶ 7.I). He estimated the size of the class by looking at the number of

"California yearbooks in PeopleConnect's database." Docket No. 141 (Kupperberg Decl. ¶ 11).

Also, in their reply brief in support of class certification, Plaintiffs argued that there would not be

individualized inquiries with respect to the Communications Decency Act immunity defense

because "[t]here are a little over 1,000 California yearbooks that PeopleConnect uploaded within

the relevant period, only a subset of which were donated. For immunity, PeopleConnect must

show it reasonably believed at the time of donation (not after-the-fact) that the donator was a

publisher or author. Should the Court decide this inquiry is relevant, PeopleConnect may resolve

this affirmative defense separately on a per-yearbook basis." Docket No. 227-3 (Reply at 11).

## II.      CLASS NOTICE

The parties have two disputes related to class notice.

A.      New Registered Users During Notice Period

Ms. Nolen asks that,

> in the event [she] and the Class prevail at trial after class notice goes
> out, potential class members who believe they inadvertently
> registered for a Classmates.com account between the notice date and
> the close of the opt-out period can submit an affidavit at the time
> they file a claim stating that their registration was made in the

5

United States District Court
Northern District of California

1   context of determining their class membership and they did not
    intend to give up their right to participate as a class member in this
2   case.

3   Status Rpt. at 14.

4          The Court finds this issue premature. The main concern at this juncture is to include in the

5   class notice a clear warning that becoming a registered user will take the user outside of the class

6   definition. The Court gave that guidance in a previous order. *See* Docket No. 267 (Order at 3).

7   The parties have included a warning in the long-form class notice to which class members are

8   directed via, *e.g.*, programmatic advertising and social media campaigns.

9   B.      Domain Name for Notice Website

10         Ms. Nolen has retained an expert on class action notice and claims administration, Angeion

11  Group, LLC, to assist with the notice website for the class action. Angeion has proposed to the

12  parties six domain names for the website:

13         (1) CaliforniaClassmatesLitigation.com

14         (2) CaliforniaClassmatesClassAction.com

15         (3) CaliforniaNamePhotoSearchClassAction.com

16         (4) CAYearbookClassAction.com

17         (5) YearbookSearchClassAction.com

18         (6) YearbookPhotoClassAction.com

19         Ms. Nolen prefers either (1) or (2); PeopleConnect prefers (3) or (4). PeopleConnect's

20  main objection to (1) and (2) is that each uses the brand name "Classmates" which "could create

21  confusion for people looking for the notice website and for Classmates.com"; also, (1) and (2) "do

22  not reference the theory behind the claims themselves." Status Rpt. at 17.

23         The use of the brand name is not problematic. *Cf. Keim v. ADF Midatlantic, LLC*, No. 12-

24  80577-CIV-MARRA, 2019 U.S. Dist. LEXIS 229346, at *5-6 (S.D. Fla. Feb. 1, 2019) ("As an

25  initial matter, the Court does not agree with Defendants' position that the mere mention of the

26  name 'Pizza Hut' in the proposed URL implies Pizza Hut's approval of the class action. The

27  inclusion of a defendant's name in the URL for a website where class members can obtain

28  additional information is in the Federal Judicial Council's model class notice and is therefore not

6

1   improper."). However, (1) and (2) are, apart from the Classmates name, somewhat generic; in that

2   regard, (5) has some appeal. The Court proposes "ClassmatesYearbookSearchClassAction,"

3   assuming that it is available.

4   C.    <u>Other Comments re Class Notice</u>

5         The parties have essentially agreed on the means for class notice to be given and on the

6   language to be used in the class notice. The means for class notice is reasonable. The Court has

7   some comments on the language to be used in the class notice(s).

8         1.    <u>Weisbrot Declaration, Exhibits B and C</u>

9         Exhibits B and C attached to the Weisbrot Declaration are samples of Internet banner ads

10   and social media ads. The parties have agreed to these samples. *See* Weisbrot Decl. ¶ 36.

11         Although the Court understands that the nature of these ads necessarily means that their

12   content is short, the Court is concerned that the ads are somewhat vague in nature. The ads

13   include a statement that "a class action lawsuit may affect your rights" (Exhibit B) or "your legal

14   rights may be affected by a class action. Act Now!" (Exhibit C). Should the ads include an

15   additional statement along the lines of the following?: "Class members must decide whether they

16   want to exclude themselves from the lawsuit."

17         In addition, the Court has some concern with the graduation imagery used in Exhibit C. Is

18   there yearbook imagery that can be used instead?

19         2.    <u>Weisbrot Declaration, Exhibit D</u>

20         Exhibit D attached to the Weisbrot Declaration is the class certification notice (long-form).

21   This is the notice that presumably will be available on the notice website and to which class

22   members will be directed if, *e.g.*, they click on an Internet banner ad.

23             •  Page 1. At the top of the page, the notice should have a paragraph in bold that

24                follows "**<u>NOTICE OF CLASS CERTIFICATION</u>**." The paragraph should

25                briefly inform class members that (1) a class has been certified (with the definition

26                of the class provided below) and that (2) they must decide whether they want to

27                exclude themselves from the lawsuit.

28             •  Page 1. The content of the paragraph that begins with "**IMPORTANT:**" should be

bolded in its entirety and underlined.

- Page 1 *et seq.* Each of the questions posed (starting with "**How do I know if I am a Class Member?**" and continuing on) should be numbered.

- Page 2. There is a typo in the section "**What are my options if I am a Class member?**" The phrase "(by doing nothing).)." should read instead "(by doing nothing)."

- Page 2. Regarding the section, "**How do I opt out of the Class?**," the Court understands that class members will be given 30 days to opt out. *See* Weisbrot Decl. ¶ 36. Should class members be given a little more time – *e.g.*, 45 days?

- Page 2. Regarding the section, "**How do I opt out of the Class?**," a link is provided to the opt-out form. Can the opt-out form also be included as an attachment to the class notice?

- Page 3. There should be a section on how a class member can get more information – *e.g.*, through the website or the toll-free number.

- Page 3. Should the notice close with a reminder about what the class member must do (*e.g.*, you need to act now if you want to exclude yourself from the class) as well as a reminder that, if the class member registers with Classmates.com, they cannot and will not be a member of the class.

3.    Weisbrot Declaration, Exhibit E

Exhibit E attached to the Weisbrot Declaration is the opt-out form, which can be submitted online or via mail. Should the form include a section where the individual opting out can provide other names that have been used during their school years?

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

United States District Court
Northern District of California

8

### III.    <u>CONCLUSION</u>

The Court has provided its rulings and/or guidance on both class definition and class notice above.  Where the Court has posed questions for the parties, the parties shall meet and confer and file a joint status report in response within one week of the date of this order.

**IT IS SO ORDERED**.

Dated: May 20, 2024

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

9



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALICIA NOLEN, | Case No. 20-cv-09203-EMC |
| Plaintiff, | **REDACTED PUBLICLY FILED VERSION (ECF NO. 256)** |
| v. | **ORDER CONDITIONALLY GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |
| PEOPLECONNECT, INC., | |
| Defendant. | Docket No. 190 |

Plaintiff Alicia Nolen has sued Defendant PeopleConnect, Inc. based on its ownership and operation of the website Classmates.com.  Classmates.com allows users to, *inter alia*, browse yearbooks that have been digitally scanned and uploaded and to search those yearbooks. According to Ms. Nolen, PeopleConnect has violated her rights and those of others similarly situated in California because it uses their names and photos obtained from the yearbooks – without their consent – to advertise and promote a subscription service that it offers.  The service is known as Classmates+ or CM+.

Now pending before the Court is Ms. Nolen's motion for class certification.  Ms. Nolen seeks certification of both a Rule 23(b)(3) damages class and a Rule 23(b)(2) injunctive relief class.  Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby conditionally **GRANTS** the motion.  The granting of the motion is conditioned on Ms. Nolen modifying the class definition as discussed below.

## I.        FACTUAL & PROCEDURAL BACKGROUND

A.        Second Amended Complaint

In the operative second amended complaint ("SAC"), Ms. Nolen alleges that

PeopleConnect has a "massive online database" made up of "records copied from over 400 thousand yearbooks," which she refers to as the Classmates Yearbook Collection.  SAC ¶¶ 3-4.[1] According to Ms. Nolen, PeopleConnect "uses the names, photographs, . . . likenesses, and identities in its Classmates Yearbook Collection to advertise, sell, and solicit the purchase of its 'CM+' subscription membership, which retails for up to $3 per month."  SAC ¶ 7.  Because PeopleConnect did not, as alleged, get consent from "the millions of Californians whose names, photographs, biographical information, and identities appear in [the] Classmates Yearbook Collection," Ms. Nolen asserts that PeopleConnect has violated her rights and those similarly situated.  She asserts the following causes of action:

> (1) Violation of California's right-of-publicity statute.  *See* Cal. Civ. Code § 3344(a) (providing, *inter alia*, that "[a]ny person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, . . . for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof").

> (2) Violation of California Business & Professions Code § 17200.

> (3) Unjust enrichment.

The latter two claims are essentially derivative of the first claim; thus, the parties largely focus on the § 3344 claim in their briefs.[2]

_____

[1] *See also* Lambard Decl. ¶¶ 2-3 (employee of PeopleConnect testifying that Classmates.com "hosts a digital library of over 450,000 school yearbooks"; adding that the oldest ones "date back to the 1890s" but that "the database contains yearbooks throughout the twentieth century and into the twenty-first century").

[2] In the SAC, Ms. Nolen also alleges that PeopleConnect uses individuals' names and photos

> to advertise the free version of its website, which is available to both unregistered users and registered non-paying users.  Classmates derives profit from the free version of its website by (1) selling targeted ads; (2) driving users of the free version to purchase its paid products and services; and (3) on information and belief, selling the personal information it collects from registered and unregistered users to third parties.

SAC ¶ 8.  Ms. Nolen, however, does not pursue this precise theory in her motion for class

United States District Court
Northern District of California

B.    Class Definition

In the SAC, Ms. Nolen defined the class as follows:

> [A]ll California residents who (a) are not currently subscribers of
> any Classmates services, (b) have never donated a yearbook to
> Classmates, and (c) whose names, photographs, and/or likenesses
> were extracted from yearbooks by Classmates and placed on the
> Classmates website as part of its Yearbook Collection, without
> Classmates obtaining their consent.

SAC ¶ 174.

In the pending motion for class certification, Ms. Nolen has modified the class definition. She now seeks certification of the following class:

> All persons residing in the State of California who are not registered
> users of Classmates.com and whose names and yearbook
> photographs are or were searchable on the Classmates.com website,
> where at least one such yearbook photograph became searchable for
> the first time on or after December 18, 2018.

Mot. at 5. The date was selected based on the filing of the original complaint on December 18, 2020.[3] *See* Docket No. 1 (complaint); Docket No. 177 (Order at 6) ("The parties do not dispute that under California law the statutes of limitations period for Plaintiff's § 3344 and unjust enrichment claims are each two years.").

The above class is narrower than the class as originally defined in the SAC in at least one way. The class as defined in the SAC excluded *subscribers* of Classmates.com services; the class

---

certification. Instead, she focuses on the use of name and photos to generate interest leading to the sale of PeopleConnect's subscription service. *See, e.g.*, Mot. at 2 (focusing on advertisements soliciting users to "purchase a subscription"); Mot. at 6 (discussing a website flow that "ends with solicitations for website subscriptions"); Mot. at 7 (asserting that PeopleConnect uses photos from yearbooks "as a means of soliciting subscriptions").

[3] In a footnote in its opposition, PeopleConnect challenges the use of the December 18, 2018, date. *See* Opp'n at 11 n.1 (arguing that "California disallows tolling of state-law claims filed in federal court by earlier state-law claims filed in federal court[;] [t]hus tolling began when Nolen filed her claims, March 23, 2023, which would mean claims predicated on the presentation of a yearbook added to the Classmates.com yearbook library before March 23, 2021, would be untimely"). Because PeopleConnect raised this argument in a footnote only, the Court declines to address it. The Court notes, however, that, although PeopleConnect's argument rests on tolling, the issue here may be whether Ms. Nolen's claims are entitled to relation back. *See* Fed. R. Civ. P. 15(c).

3

1  as now defined excludes anyone who is a *registered user* of Classmates.com.[4]  Registered users

2  consist of both (1) persons who have registered on the website and subscribe to Classmates.com

3  services *and* (2) persons who have registered on the website but have *not* purchased any services.

4  Because "registered user" is a broader term and the class definition excludes registered users, the

5  class has become narrower in scope.

6       For ease of reference, the Court uses the following definitions:

7       • A registered user who subscribes to Classmates.com services shall hereinafter be

8        referred to as a **Subscriber**.

9       • A registered user who has *not* purchased a subscription shall hereinafter be referred

10        to as a **Free Member**.

11       • A person who uses Classmates.com "without supplying any information or

12        registering" shall hereinafter be referred to as a **Visitor**.  Toivola Decl. ¶ 8; *see also*

13        Knutzen Decl. ¶ 2.

14  C.    <u>Subscription Ads</u>

15       Previously, the Court addressed PeopleConnect's position that its "use of Plaintiff's image

16  does not constitute a use for the purpose of advertising under § 3344 until her image is visually

17  displayed (*e.g.*, through pixels on a user's computer monitor) in connection with an advertisement

18  following a user's search."  Docket No. 204 (Order at 4).  The Court rejected PeopleConnect's

19  position, ruling as follows:

20

21          Although Defendant states otherwise, they are arguing for a *de facto*
        requirement of third-party viewership for certain § 3344 claims –

22          essentially, even if users *could* interact with Plaintiff's images as
        part of an advertising flow, Plaintiff's claims fail because she never

23          alleges that any user ever *actually* viewed them in this way, and thus
        they were not visually used in a commercial advertisement.  *See*

24          Mot. at 11 ("[T]he theory of liability Plaintiffs have pleaded – that
        PeopleConnect violates Section 3344 by hosting their school

25          yearbooks on Classmates.com, even if the photographs from those
        yearbooks never are shown to anyone, let alone shown to someone

26          as part of a so-called advertisement – is not viable as a matter of
        law."); Reply at 2 (contending that Plaintiff's claims fail "regardless

27

28  ────────────────────

[4] To become a registered user, a person fills out a form online (presented on Classmates.com) and
agrees to the website's Terms of Service.  *See* Toivola Decl. ¶ 8.

<div align="center">4</div>

of what anyone saw").

> The Court disagrees: Defendant commercially used Plaintiff's image the moment the image became a publicly accessible part of Defendant's advertising flow.  To hold otherwise would impose a visual display requirement that is at odds with the single publication rule of claim accrual[5] and that has no basis in the text or purpose of § 3344.

Docket No. 204 (Order at 4-5) (emphasis in original); *see also* Docket No. 204 (Order at 6) (quoting Supreme Court decision comparing the web, "'from the readers' viewpoint, to both a vast library including millions of readily available and indexed publications and a sprawling mall offering goods and services'").  The Court adheres to its prior ruling.  Furthermore, as described below, the value of Plaintiff's name and images lies in its contribution to the *collection* of names and images in a yearbook which entices visitors to become members and subscribers.  Plaintiff's claim is that as part of a stable of names and images, the availability of one's name and image, along with others, is what drives PeopleConnect's value and advertising flow.

To be sure, although the Court has held that there is no viewership requirement, Ms. Nolen must still show that a person's name or image is in fact used as part of an advertising flow for liability to obtain – *i.e.*, that a name or image was used "for purposes of advertising or selling, or soliciting purchases" of the CM+ subscription service.  Cal. Civ. Code § 3344.  The Court, therefore, briefly addresses what a subscription ad looks like and how a person using the Classmates.com website could come across it.[6]

As an initial matter, the Court takes note that Visitors and Subscribers to Classmates.com do not ever (and cannot ever) see subscription ads.

- Subscribers do not see subscription ads because they have already subscribed to the

---

[5] *See* Docket No. 177 (Order at 7) ("Under the single-publication rule, claims accrue . . . when the relevant material is first made publicly available.  Were the single-publication rule to apply without equitable exceptions, Plaintiff's claims would accrue on June 14, 2014, when his image became publicly available on the Classmates.com website [*i.e.*, when his photographs were uploaded onto the website].").

[6] PeopleConnect has submitted the Toivola Declaration which goes through in detail navigation of the Classmates.com website, both on a computer and on a mobile device.  Although there are some differences between the computer experience and the mobile device experience, those differences do not appear to be material for purposes of the pending motion.

United States District Court
Northern District of California

5

service.

- As for Visitors, apparently, PeopleConnect has made the decision not to show them subscription ads (*i.e.*, effectively choosing to delay any offer to subscribe until after a Visitor registers and becomes a Free Member).

Thus, the only people who see subscription ads are those who are Free Members. Notably, however, Plaintiff contends that Visitors are induced by the collection of names and images in yearbooks to register and become Free Members. This is done by a kind of teaser. Specifically, a Visitor to Classmates.com is able to see only a few pages of a yearbook in full size with full resolution; the remainder of the yearbook can be seen only in small size with low resolution. For a Visitor to see all of the pages of a yearbook in full size with full resolution, she must become a Free Member. *See* Part I.C.1.a- to -.b (discussing Browse View and Grid View).

A Free Member comes across subscription ads in several ways – *e.g.*:

- when she first registers to become a Free Member;
- when she logs in to the website as a Free Member; and
- sometimes, when she does searches on the website as a Free Member.

Ms. Nolen has targeted two specific ways in which the ads allegedly violate the law. Both ways involve the searching of a yearbook – in particular, by a person's name. PeopleConnect labels the two ways at issue the "Sequence Theory" and the "Banner Theory." For convenience, the Court uses these labels as well.[7]

1.  Sequence Theory

A Visitor to Classmates.com has the ability to browse through or search yearbooks. Browsing is essentially "flipping through" a yearbook. Searching is essentially using a search bar to search for text in a yearbook (*e.g.*, "John" or "softball"). Although Ms. Nolen's case seems to focus on only the searching of yearbooks, and not mere browsing, the Court discusses below both browsing and searching so that there is context for its later analysis.

---

[7] A person who uses the Classmates.com website can get to a yearbook in various ways (as described in the Toivola Declaration). For purposes of the pending motion, how a person navigates the website to get to a yearbook is not material. The bottom line is that a person can get to a yearbook to browse and/or search.

6

1   A Visitor who browses *or* searches a yearbook will likely come across a pop-up box that

2   encourages her to register and become a Free Member (as described below).  As noted above, one

3   of the benefits of being a Free Member is the ability to access the entirety of a yearbook in full

4   size with full resolution.  *See also* Toivola Decl. ¶ 75 (indicating that other benefits include, *e.g.*,

5   being able to "visit[] the profiles of other Free Members and Subscribers," "sending messages to

6   other Free Members and Subscribers, and receiving messages from Subscribers").

7        If the Visitor does register and becomes a Free Member, then a new webpage is displayed

8   that includes an offer to subscribe to CM+ – *i.e.*, the subscription ad.



21  Toivola Decl. ¶ 17 (subscription ad).

22       The subscription ad itself does not contain any names or photos from yearbooks.

23  However, Ms. Nolen's position is that the website has a flow which essentially uses names and

24  photos from yearbooks to lead a Free Member to the subscription ad and entice the Free Member

25  to subscribe to the CM+ subscription service.  Benefits of becoming a Subscriber include the

26  following:

27           Subscribers can see more information about other Free Members
             and Subscribers, such as the names of other Free Members and
28           Subscribers who visited the Subscriber's Classmates.com profile

7

1
2

and who have clicked a link indicating that they 'remember' the Subscriber.  Subscribers also can exchange private Classmates.com messages with other Subscribers or Free Members and receive a 20% discount on hardcover yearbook reprints.

3
Toivola Decl. ¶ 90.

4   In short, a Visitor (1) sees names and photos from yearbooks as a result of browsing or a

5   search, (2) is prompted to register, (3) registers, and (4) then sees the subscription ad.  Hence, this

6   process is called the "Sequence Theory."

7   In its opposition, PeopleConnect emphasizes that a Visitor is able to register – and thereby

8   see a subscription ad – without ever browsing or searching a yearbook.  *See also* Knutzen Decl. ¶

9   9 (asserting that, in the past two years, "less than ███ of all Visitors caused a yearbook page to be

10  displayed and then registered for a free account with Classmates.com[;] [t]he other ███ of

11  Visitors in this period did something else, like registering without first causing any yearbook

12  pages to be displayed or causing yearbook pages to be displayed and then not registering") **[filed**

13  **under seal]**.  PeopleConnect suggests that this is because of the way that the website is set up –

14  *i.e.*, a Visitor who follows the website's "obvious prompts" will register before ever looking at a

15  yearbook.  Toivola Decl. ¶ 10 (discussing "Direct Registration Flow").  But this point does not

16  materially impact the analysis for the pending motion for class certification; it does not address

17  Ms. Nolen's theory that PeopleConnect uses names and photos to entice Visitors to register and

18  become Free Members who are then induced to subscribe to the CM+ product – that flow obtains

19  even if less than all visitors take this path so long as some do.

20  Below the Court describes in greater detail browsing and searching of a yearbook by a

21  Visitor, which will lead to a subscription ad if the Visitor registers and becomes a Free Member.

22  a.   Browsing

23  A Visitor who browses a yearbook can "click" through the cover and the first four, two-

24  page spreads.  The cover and initial pages are in full size and full resolution.  PeopleConnect calls

25  this "Browse View."  *See* Toivola Decl. ¶ 28 *et seq.* (images).

26  If the Visitor tries to click past the cover and initial pages, then a pop-up box appears

27  superimposed over thumbnails of the entire yearbook.  The thumbnails – precisely because they

28  are thumbnails – are small in size and have low resolution.  PeopleConnect calls this "Grid View."

United States District Court
Northern District of California

8

*See* Toivola Decl. ¶ 38 *et seq.* (images).  The pop-up box encourages the Visitor to register and become a Free Member in order to see the thumbnails in full size with high resolution.  The Visitor can close the pop-up box but, until she registers and becomes a Free Member, she can see only the cover and initial pages in Browse View; the remainder can be seen in Grid View only.

As noted above, if the Visitor registers by filling out the pop-up box, then she is taken to a new webpage that contains the subscription ad.

        b.    <u>Searching</u>

In both Browse View and Grid View, there is a search bar that allows a Visitor to type in a word (*e.g.*, "John" or "softball").  The search results are displayed on a new webpage.  They have thumbnails of the yearbook pages that contains the searched-for text.  The thumbnails are small in size and low in resolution.  The search results also have small portions of text from the yearbook pages (containing the searched-for text).

///

United States District Court
Northern District of California

9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California



Toivola Decl. ¶ 45 (image).  If the Visitor clicks on a specific search result, then a pop-up box appears superimposed over a Grid View of the yearbook.  As above, the pop-up box is a form that essentially encourages the Visitor to register and become a Free Member.  If she does click to register, she is then taken to a new webpage that contains the subscription ad.

As indicated above, Ms. Nolen's Sequence Theory is predicated on a Visitor *searching* a yearbook by typing in a person's name, and not based on a Visitor simply *browsing* a yearbook. Searching leads to exposure to ads.  As noted above, if the Visitor registers by filling out the pop-up box, then she is taken to a new webpage that contains the subscription ad.

D.     Banner Theory

Like the Sequence Theory, the Banner Theory also involves the searching of a yearbook (as opposed to browsing).

Once a Visitor becomes a Free Member, she is "not limited to viewing high-resolution images of only the first several pages in a yearbook"; in other words, "[u]nlike a Visitor, a Free member can view high-resolution images of all yearbook pages."  Toivola Decl. ¶ 86.  (A Free Member can still use Grid View but she can click on a yearbook page in Grid View and get it displayed in Browse View.)

If the Free Member simply browses the yearbook (in Browse View or Grid View), no subscription ad is ever displayed.  *See* Toivola Decl. ¶ 86 (stating that third-party ads or ads for yearbook reprints may be displayed, but not subscription ads).

However, once the Free Member searches the yearbook – using a search bar in which text can be typed (an event that seems likely) – the search results are displayed on a new webpage, and next to the search results there *may* be a subscription ad.  Similar to above, the search results have thumbnails of the yearbook pages that contains the searched-for text; the search results also have small portions of text from the yearbook pages (containing the searched-for text).  Next to the search results there is space for five "banners."  "████████████████████████████ ████████████████████████"  Toivola Decl. ¶ 82.

///

1    Toivola Decl. ¶ 84 (subscription ad).  The subscription ad itself does not contain any names or

2    photos from yearbooks.  *See* Toivola Decl. ¶ 82 ("None of the content displayed in the Banners

3    includes any information from the search results themselves, like the names or photos of

4    individuals searched.").  The subscription ad, however, is in proximity (*i.e.*, next to) the search

5    results containing names and photos from yearbooks.  Importantly, the search – *e.g.*, for a person's

6    name – is what ultimately led to the subscription ad.

7                                      **II.    LEGAL STANDARD**

8             Federal Rule of Civil Procedure 23 expressly authorizes class actions.  *See* Fed. R. Civ. P.

9    23(a) (providing that "[o]ne of more members of a class may sue or be sued as representative

10   parties on behalf of all members").  Before certifying a class, the Court "must conduct a 'rigorous

11   analysis' to determine whether the party seeking certification has met the prerequisites of Rule

12   23."  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).  The Supreme

13   Court has made it clear that "Rule 23 does not set forth a mere pleading standard."  *Wal-Mart*

14   *Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Comcast Corp. v. Behrend*, 569 U.S. 27,

15   33 (2013).  Rather, the party seeking certification must "affirmatively demonstrate" her

16   compliance with the requirements of both Rules 23(a) and 23(b).  *Wal-Mart*, 564 U.S. at 349.

17            Rule 23(a) permits plaintiffs to sue as representatives of a class only if (1) "the class is so

18   numerous that joinder of all members is impracticable" ("numerosity" requirement); (2) "there are

19   questions of law or fact common to the class" ("commonality" requirement);  (3) "the claims or

20   defenses of the representative parties are typical of the claims or defenses of the class"

21   ("typicality" requirement); and (4) "the representative parties will fairly and adequately protect the

22   interests of the class" ("adequacy" requirement).  Fed. R. Civ. P. 23(a)(1)-(4).

23            If each of the Rule 23(a) requirements are satisfied, the purported class must also satisfy

24   one of the three prongs of Rule 23(b).  Here, Ms. Nolen seek certification under both Rule

25   23(b)(2) and (b)(3).

26            •    Under Rule 23(b)(2), a class action may be maintained if "the party opposing the

27                 class has acted or refused to act on grounds that apply generally to the class, so that

28                 final injunctive relief or corresponding declaratory relief is appropriate respecting

United States District Court
Northern District of California

13

**1-ER-23**

the class as a whole." Fed. R. Civ. P. 23(b)(2).

- Under Rule 23(b)(3), a class action may be maintained if "court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members" ("predominance" requirement), and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" ("superiority" requirement).  Fed. R. Civ. P. 23(b).

The underlying merits of the case, while admittedly relevant at the class certification stage, should not overly cloud the Court's certification analysis – the only question presently before the Court is whether the requirements of Rule 23 are met.  *See Comcast*, 569 U.S. at 33-34.  The fact that certain elements of proof may favor the defendant on the merits does not negate class certification; the issue is whether the proof is amenable to class treatment.  Indeed, it may be the case that the defendant, by prevailing on the merits of an issue that is decided on a classwide basis, will benefit from the certification.  Again, the issue is whether proof, whether it favors the plaintiff or the defendant, is amenable to class treatment.

Moreover, "[n]either the possibility that a plaintiff will be unable to prove [her] allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule."  *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).  Indeed, even "after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation."  *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160 (1982).  Ultimately, whether to certify a class is within the discretion of the Court.  *See Levya v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013); *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL–CIO CLC v. ConocoPhilips Co.*, 593 F.3d 802, 810 (9th Cir. 2010).

### III.    RULE 23(b)(3) CLASS

The Court focuses first on the Rule 23(b)(3) class – primarily because the damages class is the driver of this case, and if a damages class should be certified, then necessarily a Rule 23(b)(2) class should be certified as well.  *See* Fed. R. Civ. P. 23(b)(2) (providing that a class may be

14

1    certified if the Rule 23(a) requirements are met and "the party opposing the class has acted or

2    refused to act on grounds that apply generally to the class, so that final injunctive relief or

3    corresponding declaratory relief is appropriate respecting the class as a whole"). PeopleConnect's

4    opposition does not dispute such.

5        For the Rule 23(b)(3) class, PeopleConnect does not challenge numerosity. *See also* Mot.

6    at 5 (stating that "[a] search on Classmates.com for 'John Smith' limited to yearbooks in

7    California yields more than 97,000 results" and for "'Maria Garcia' yields more than 23,000

8    results[;] [e]ven were the proposed Class limited to California residents with those two common

9    names, numerosity would be satisfied"). Rather, PeopleConnect's main challenge is to

10   commonality/predominance; it also makes some arguments related to typicality/adequacy and

11   superiority.

12   A.    Commonality/Predominance

13       To meet the commonality requirement, "a party must demonstrate that they and the

14   proposed class members have suffered the same injury and have claims that depend on a common

15   contention capable of class-wide resolution." *Willis v. City of Seattle*, 943 F.3d 882, 885 (9th Cir.

16   2019). This

17

18        "means that the determination of [the common contention's] truth or
         falsity will resolve an issue that is central to the validity of each one
19        of the claims in one stroke." The commonality element may be
         fulfilled if the court can determine "in one stroke" whether a single
20        policy or practice which the proposed class members are all subject
         to "expose them to a substantial risk of harm."

21   *Id.*

22       As for the predominance requirement, it is "'more demanding than [the commonality

23   requirement in] Rule 23(a).'" *Vaquero v. Ashley Furniture Indus.*, 824 F.3d 1150, 1154 (9th Cir.

24   2016). The predominance requirement "asks the court to make a global determination of whether

25   common questions prevail over individualized ones." *Ruiz Torres v. Mercer Canyons Inc.*, 835

26   F.3d 1125, 1134 (9th Cir. 2016). The Ninth Circuit has cautioned that

27

28        [p]redominance is not . . . a matter of nose-counting. . . . [M]ore
         important questions apt to drive the resolution of the litigation are

15

*United States District Court*
*Northern District of California*

given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class.  [Predominance] is an assessment of "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."

*Id.*; *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) ("The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'").

In its papers, PeopleConnect makes a number of arguments related to the commonality and/or predominance requirements.  Each is addressed below.

    1.    <u>Commonality/Predominance: "Direct Connection" Between Use and Commercial Purpose</u>

Under § 3344,[8] "[a]ny person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, . . . for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof." Cal. Civ. Code § 3344(a).  Thus, for a claim under § 3344, a plaintiff must prove the following elements: (1) the defendant's knowing use of the plaintiff's identity; (2) the appropriation of the plaintiff's identity to the defendant's advantage, commercially or otherwise; (3) a direct connection between the defendant's use and the commercial purpose[9]; (4) lack of the plaintiff's consent; and (4) resulting injury to the plaintiff.  *See In re NCAA Student-Athlete Name & Likeness Licensing Litig.)*, 724 F.3d 1268, 1273 n.4 (9th Cir. 2013) ("The elements of a right-of-publicity claim under California common law are: '(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage,

---

[8] As noted above, Ms. Nolen's primary claim is for a violation of § 3344.  Her other claims (unfair competition and unjust enrichment) are essentially derivative.

[9] The requirement of a direct connection is also found in the statute – *i.e.*, § 3344(e).  *See* Cal. Civ. Code § 3344(e) ("The use of a name, voice, signature, photograph, or likeness in a commercial medium shall not constitute a use for which consent is required under subdivision (a) solely because the material containing such use is commercially sponsored or contains paid advertising. Rather it shall be a question of fact whether or not the use of the person's name, voice, signature, photograph, or likeness was so directly connected with the commercial sponsorship or with the paid advertising as to constitute a use for which consent is required under subdivision (a).").

16

United States District Court
Northern District of California

commercially or otherwise; (3) lack of consent; and (4) resulting injury.'  The same claim under

California Civil Code § 3344 requires a plaintiff to prove 'all the elements of the common law

cause of action' plus 'a knowing use by the defendant as well as a direct connection between the

alleged use and the commercial purpose.'").

        In its opposition brief, PeopleConnect does not challenge the amenability of elements (1)

and (2) of § 3344 to class treatment.  Rather, it focuses on (3) – arguing that there is no common

proof that there is a *direct connection* between the display of a person's name and photo and one

of its subscription ads.  In its papers, PeopleConnect asserted as follows:

> Here, **not all** class members' names and photographs have been
> used in a direct connection to advertising. . . . Plaintiff identified two
> instances in which she claims that an individual's name and/or
> photograph appear with any level of proximity at all to an offer for a
> subscription, the Sequence and Banner Theories.  The problem is
> that the webpages on which an offer for a paid subscription is made .
> . . *are not generated, and thus do not exist*, until a user takes certain
> volitional actions on the Website and beyond accessing those
> materials.  This, then, is not a question of *access*, but of *creation*.
> Absent such creation, there is no connection between a putative
> class member's likeness and an advertisement to speak of, let alone
> a direct connection.

Opp'n at 19-20 (italics in original; bold added).  *See, e.g.*, Opp'n at 20 (contending that, for the

Sequence Theory, no subscription ad exists in proximity to a name and/or photo from a yearbook

unless a Visitor accesses a yearbook, is prompted to register as a Free Member, registers, and then

sees a subscription ad); Opp'n at 21 (contending that, for the Banner Theory, no subscription ad

exists in proximity to a name and/or photo from a yearbook unless a Free Member conducts a

search of a yearbook and, even then, the five banners that are displayed next to the search results

may not contain a subscription ad).

        Essentially, PeopleConnect's argument above boils down to the following: when

PeopleConnect first uploaded a person's name and photo onto the website (as part of a yearbook),

that only gave rise to the *possibility* that a subscription ad would be generated in proximity to the

name and/or photo of the person; no subscription ad *actually existed* at that time.  A subscription

ad did not exist until a search was conducted.

        Notably, although the above was a major contention made by PeopleConnect in its papers,

United States District Court
Northern District of California

17

1    it essentially dropped the argument at the hearing.  PeopleConnect conceded that the issue was

2    whether a person was "searchable" (*i.e.*, could be searched) rather than having been actually

3    "searched."

4            Even if PeopleConnect did not waive the argument, the Court would reject it for several

5    reasons.

6        • First, the Court previously rejected PeopleConnect's contention that, "even if users

7            *could* interact with Plaintiff's images as part of an advertising flow, Plaintiff's

8            claims fail because she never alleges that any user ever *actually* viewed them in this

9            way, and thus they were not visually used in a commercial advertisement."  Docket

10           No. 204 (Order at 4) (emphasis in original).

11       • Second, PeopleConnect's contrasting of the *accessibility* of an ad with the *creation*

12           of an ad is predicated on a crammed view of the Court's prior order.  Notably, in its

13           prior order, the Court quoted a Supreme Court decision comparing the web, "'from

14           the readers' viewpoint, to both a vast library including millions of readily available

15           and indexed publications and a sprawling mall offering goods and services.'"

16           Docket No. 204 (Order at 6).  PeopleConnect may be correct that, technically, a

17           subscription ad would not be generated until, *e.g.*, a Free Member did a search for a

18           person's name in a yearbook.  But that ignores the fact that PeopleConnect's

19           system was *set up* to generate a subscription ad after a search; thus, in a broader

20           sense there was a preexisting subscription ad; it simply was not visually displayed

21           until later.  *See also* Reply at 4 (arguing that "Class members' names and

22           photographs are published *and ready to populate the advertising flow at any time*")

23           (emphasis added).

24       • Third, PeopleConnect's argument basically assumes that a person's name and

25           photo have commercial value only if they were actually the subject of a search.  But

26           this ignores two theories that a reasonable jury could endorse: (1) a person's name

27           and photo has at least some commercial value (even if small) based purely on their

28           potential of being the subject of a search; and (2) yearbooks drive interest in

18

United States District Court
Northern District of California

Classmates.com, and therefore have commercial value, and a person's name and photo is part of the broader *collection* of names and photos in a given yearbook, and that person's name and image contributes to the value of that collection.

- Finally, PeopleConnect's argument suffers from a deeper flaw.  Section 3344 requires a direct connection between the defendant's use and the "commercial purpose" of the defendant.  PeopleConnect reads this element of § 3344 too narrowly:  the element does not require a direct connection between the use of the plaintiff's likeness and particular ads.  It requires a direct connection between the use and a "commercial purpose."  The "commercial purpose" as alleged by Ms. Nolen is to increase the sale of subscriptions.  PeopleConnect's focus on singular ads and whether they appear proximately to a particular person's name or image myopically loses the forest from the trees of § 3344.  The point is that a person's name and images are used for the commercial purpose of inducing Visitors to become Free Members who are then induced to become paid Subscribers.

Whatever the ultimate merits of the Plaintiff's theory, this is an issue that is subject to class treatment as it involves proof common to the class.

### 2. Commonality/Predominance: Readily Identifiable Name and Photo

PeopleConnect contends next that the commonality/predominance requirements cannot be met because, for a § 3344 violation, the defendant's use of the plaintiff's name and/or photo must involve a use in which the plaintiff is readily identifiable, *see* Mot. at 7 (arguing that it is "commonsense" that "a 'likeness' is not used in an 'advertisement' unless the person can be 'readily identifiable'"), and that necessitates a case-by-case determination – *i.e.*, individualized inquiries are necessary.  For example:

- Names and/or photos likely are not readily identifiable in Grid View (because the thumbnails are small in size and have low resolution).
- Even in Browse View, a person may not be readily identifiable – *e.g.*, if there is a group photo such that the face of an individual is small or may be partially covered, etc.

19

In considering PeopleConnect's argument, the Court first bears in mind that § 3344 does impose a "readily identifiable" requirement – for photos at least.  Section 3344(b) provides as follows:

> (b)   As used in this section, "photograph" means any photograph or photographic reproduction, still or moving, or any videotape or live television transmission, of any person, such that the person is *readily identifiable.*
>
> (1)   *A person shall be deemed to be readily identifiable from a photograph when one who views the photograph with the naked eye can reasonably determine that the person depicted in the photograph is the same person who is complaining of its unauthorized use.*
>
> (2)   If the photograph includes more than one person so identifiable, then the person or persons complaining of the use shall be represented as individuals rather than solely as members of a definable group represented in the photograph. A definable group includes, but is not limited to, the following examples: a crowd at any sporting event, a crowd in any street or public building, the audience at any theatrical or stage production, a glee club, or a baseball team.
>
> (3)   A person or persons shall be considered to be represented as members of a definable group if they are represented in the photograph solely as a result of being present at the time the photograph was taken and have not been singled out as individuals in any manner.

Cal. Civ. Code § 3344(b).

Although § 3344(b) is targeted to photos, PeopleConnect maintains that a similar principle applies to names.  As a general matter, this is true, as indicated by the Restatement Third of Unfair Competition.  *See* Rest. 3d of Unfair Competition § 46 & cmt. d (providing that "[o]ne who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade is subject to liability"; commenting that, "[t]he use must . . . be sufficient to identify the person whose identity the defendant is alleged to have appropriated" – *e.g.*, "[i]f the appropriation consists of the use of a name, . . . the name as used by the defendant must be understood by the audience as referring to the plaintiff," and "[s]imilarly, in the case of an alleged visual likeness, the plaintiff must be

20

reasonably identifiable from the photograph or other depiction").  However, with possible exceptions as discussed below, a person is usually readily identifiable by their name, especially when viewed in context of having attended a particular school in a particular year.

A photo without being accompanied by a name potentially raises more problematic issues – *e.g.*, if a Visitor or Free Member is simply browsing a yearbook (as opposed to searching a yearbook using a person's name as the search term) and photos are displayed without any names associated with the photos.  In these circumstances, even in Browse View (*i.e.*, full-page size and full resolution), individualized inquiries would to be needed to see if a person in a photo is readily identifiable where no name is attached.  It is certainly possible, and could well raise individualized determinations as to whether Section 3344(b)'s requirement of identifiability is met.

Ms. Nolen's position that no individualized inquiries are needed is largely dependent on a *search* being conducted using a person's *name* which, under the Sequence Theory, can lead to a subscription ad as part of the website flow or which, under the Banner Theory, can lead to a subscription ad being displayed next to search results. Where a search within the website is used, *the person's name is the critical part of a person being readily identifiable.*  Indeed, in her reply brief, and at the hearing, Ms. Nolen admitted that it is the name, and not the photo, that is the key. *See, e.g.*, Reply at 1-2 (arguing that a person can be readily identifiable based on the combination of name, school, and year of yearbook – all of which is clearly visible after a name is searched for in the search bar).  In other words, it is the name on which Ms Nolen will rely in the first instance to establish a § 3344 violation by common evidence: Ms. Nolen can show how, generally speaking, a search can be done by a name and that will yield search results with, *e.g.*, a banner ad promoting the CM+ subscription service.

In light of that concession by Ms. Nolen, the proposed class definition – as currently worded – is arguably overbroad or vague.  The proposed class definition is: "**All persons residing in the State of California who are not registered users of Classmates.com and whose names and yearbook photographs are or were searchable on the Classmates.com website, where at least one such yearbook photograph became searchable for the first time on or after December 18, 2018.**"  Mot. at 5 (emphasis added).  This definition is problematic to the extent it

United States District Court
Northern District of California

1   is keyed to photos which, as indicated above, would necessitate individualized inquiries (absent

2   photos being accompanied by *names*) in order to be searchable.

3       Accordingly, the Court orders the parties to meet and confer to see if they can reach an

4   agreement on a modified class definition – *i.e.*, to limit the class to the use of a name or a name *in*

5   *conjunction with* a photo.

6       The Court acknowledges that, in its sur-reply[10] and at the hearing, PeopleConnect

7   indicated that it would oppose even a more narrowly tailored class definition.  PeopleConnect

8   contends that a § 3344 violation cannot be established by common evidence because, even if

9   searches are done by name, search results will need to be individually scrutinized to see if a

10  person's name and photo will actually appear.  PeopleConnect points to the following evidence:



- "When PeopleConnect ▮▮▮▮ a yearbook, ▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as discussed in
  Michael Lambard's previous declaration."  Mathew Sur-Reply Decl. ¶ 3 **[filed
  under seal]**.  OCR, however, has limitations; "not all text on a yearbook page is
  successfully recognized or picked ▮▮▮▮▮▮▮▮▮."  Mathew Sur-Reply
  Decl. ¶ 4 **[filed under seal]**. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Mathew
  Sur-Reply Decl. ¶¶ 5-6, 8-10 **[filed under seal]**. ▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮ Mathew Sur-Reply ¶ 13 **[filed under seal]**.

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[10] The Court grants PeopleConnect's request for leave to file a sur-reply.

1 ██████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ████████████████████████████████████████ Mathew

4 Sur-Reply Decl. ¶ 14 (emphasis added) **[filed under seal]**. ████████████

5 ██████████████████████████████████████████████████████

6 ██████████████████████████████████████████████

7 ██████████████████████████████████████████████████████

8 █████████████████████████████████████ Mathew Sur-Reply Decl. ¶

9 15 **[filed under seal]**.  "[S]earch results will only provide up to the first three

10 excerpts on any given page that match any of the search terms.  Thus, if there

11 are more than three matching hits on the yearbook page for any of the search

12 terms, any hits beyond the first three will not be displayed."  Toivola Sur-Reply

13 Decl. ¶ 8.  In addition, "[i]f the search terms produce hits on more than 500

14 different yearbook pages, the Website will only display the first 500 results."[11]

15 Toivola Sur-Reply Decl. ¶ 13.

16         Based on the above, PeopleConnect argues that, even if searching by name is the basis of

17 Ms. Nolen's claims, there will need to be individualized inquiries, thus making commonality and

18 predominance a problem.  According to PeopleConnect, Ms. Nolen incorrectly assumes that

19 "every individual whose name is in a yearbook that was ████████████ necessarily can be included

20

21 _____

[11] In addition to the above, PeopleConnect notes that

22

23         the order of search results and which results are displayed can
        change over time.  This is due in part to the fact that new yearbooks
        are added to the Website library and names on the Website are

24        ████████████  Therefore, a search of particular terms is
        not static – a search run at one time may produce one set of results,

25        but an identical search run at a later time may produce a *different* set
        of results.

26

27 Mathew Decl. ¶ 17 (emphasis in original) **[filed under seal]**; *see also* Toivola Sur-Reply Decl. ¶

16 **[filed under seal]**. ████████████████████████████████████████

28 ███████████████████████████ Mathew Decl. ¶ 18 **[filed under seal]**; *see also* Toivola Sur-
Reply Decl. ¶ 16 **[filed under seal]**.

23

United States District Court
Northern District of California

<div style="writing-mode: vertical">United States District Court
Northern District of California</div>

1    in a search results that lists the person's name, school, city, state and year of yearbook in bold

2    text." Sur-Reply at 6 **[filed under seal]**. But the OCR program may not pick up all names, and

3    "[t]here is no mechanical way to determine which names ███████████████ in scanned

4    yearbooks and which names ████████████." Sur-Reply at 6 **[filed under seal]**. And "even if

5    a person's name has been recognized ███████████, that person's name and other

6    information will not necessarily appear in the bolded text format that Plaintiff now challenges

7    because of the way search results are compiled and presented" – *e.g.*, the search results have a

8    limit of 500 individual yearbook pages, and "only the first three responsive terms for each search

9    result will be shown." Sur-Reply at 7. Finally, PeopleConnect notes that problems may arise

10   where people may share the same name or have similar names, which underscores why

11   individualized inquiries are needed even for searches done by name. *See, e.g.*, Toivola Sur-Reply

12   Decl. ¶¶ 17-20 (discussing Ms. Nolen's 1997 yearbook; testifying that a manual search of the

13   yearbook index revealed that there are "nine instances of people who have the exact same name

14   but are at least two different people," that there are two instances in which there are "separate

15   entries . . . for the same name . . . but a review of those pictures suggests they may be the same

16   person," and that there are "twenty examples of different individuals with names that are

17   exceedingly similar").

18        The Court is not persuaded that searching by names presents a danger that so many

19   individualized inquiries on identity will be required that commonality or predominance will be

20   negated. Admittedly, ███████████████, the person is not a member of the class (*i.e.*,

21   the person is not "searchable" as required by the class definition). But PeopleConnect fails to

22   explain how this fact will require substantial individualized inquiries. If one's identity is not

23   searchable, that person would not be part of the class, an issue that, if necessary, could be

24   determined at a later prove-up stage.

25        Furthermore, PeopleConnect has failed to show ████████████████████

26   ███████████ has any significant impact on class certification. For example, many yearbooks

27   have a section composed of individual student portraits, with students being organized by class –

28   *e.g.*, freshmen, sophomores, juniors, and seniors. A portrait typically has the student's name in

24

**1-ER-34**

1    close proximity to the portrait, such as underneath the photo or at the end of a row of photos.

2    There is no indication that ████████████████████████████████████████████████

3    █████████████████████████. Therefore, ██████████████████████████████████████

4    ████████████████████████ that would essentially be immaterial because Ms. Nolen is not

5    asserting claims that are dependent on the number of times a search yields a person's name and

6    photo; rather, she is seeking statutory damages of $750 per class member because a class

7    member's name is searchable (*i.e.*, capable of being searched) and regardless of the number of

8    times a class member's name and photo is in a given yearbook.  Once the name of the student is

9    searchable – *e.g.*, through the individual student portraits – the fact that the student appears

10    elsewhere in other formats does not change the damages sought.

11         Finally, the Court acknowledges that there may be occasions in which people share the

12    same name or have similar names, and therefore some individualized inquiries will be necessary.

13    But PeopleConnect has failed to show that this problem is so extensive or pervasive that

14    commonality or predominance is threatened, especially when the confusion must occur within the

15    same school within a given year.  To be sure, PeopleConnect contends that, for Ms. Nolen's 1997

16    yearbook, there are some 30 different instances in which people had shared or similar names.  But

17    it has not demonstrated that any confusion of identity cannot be easily resolved.  In any event, if

18    the student body for that year was, *e.g.*, 1,000 people, then the issue of shared/similar names

19    would be a very small percentage, not something prevalent and difficult enough to defeat

20    predominance.

21         PeopleConnect makes two additional arguments in its sur-reply that are worth mentioning:

22    (1) for the Banner Theory, ██████████████████████████████████████████

23    ████████████████████ *see* Sur-Reply at 8 ████████████████████████████

24    █████████████████████████████████████████████████████; and

25    (2) "to the extent the bare existence of creating ████████████████ is actionable as an actual

26    'use' under Section 3344, it is at best an incidental use."  Sur-Reply at 11.  Neither of these

27    arguments is compelling.  The argument in (1) is a variant of the viewership requirement which

28    the Court has already rejected.  And PeopleConnect has not offered any evidence that, *e.g.*, there is

1  an algorithm that makes that banner ad extremely unlikely to appear at all.  As for the argument in

2  (2), that seems to be a merits argument, *i.e.*, not an argument appropriate for class certification

3  purposes.

4          To be sure, the Court is not foreclosing that some individualized inquiries on reasonable

5  identifiability may be needed where searches are based on a person's name.  The Court is simply

6  not convinced at this time that the problem is so pervasive that the commonality/predominance

7  requirements cannot be met.[12]

8          3.    Commonality/Predominance: Consent

9          As indicated above, one of the elements of a § 3344 claim is a lack of consent by the

10  plaintiff to the defendant's use of her identity.  *See* Cal. Civ. Code § 3344(a) (providing that

11  "[a]ny person who knowingly uses another's name, . . . photograph, or likeness . . . without such

12  person's prior consent . . . shall be liable for any damages sustained"); *NCAA*, 724 F.3d at 1273

13  n.4 (noting that one element of a § 3344 claim is the lack of the plaintiff's consent).

14          Ms. Nolen does not seem to dispute that, in theory, consent can be an individualized issue.

15  *Cf., e.g.*, *Kihn v. Bill Graham Archives LLC*, No. 20-17397, 2022 U.S. App. LEXIS 9, at *7 (9th

16  Cir. Jan. 3, 2022) (in copyright case, taking note of district court's conclusion that "class

17  certification was warranted because Defendants have pointed to written agreements with

18  'substantially identical material terms' to suggest that class members consented to the

19  recordings[;] [b]ut those agreements in fact vary as to the artists, performances, and rights they

20  purport to cover," and "[d]etermining whether any performer or composer consented to the

21

22  _____

[12] Moreover, even if there were a possible problem here, Federal Rule of Civil Procedure 23(c)(4)
23  provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with
respect to particular issues."  Fed. R. Civ. P. 23(c)(4).  *See, e.g.*, Fed. R. Civ. P. 23(c)(4), 1966
24  advisory committee notes (explaining that, "in a fraud or similar case the action may retain its
'class' character only through the adjudication of liability to the class; the members of the class
25  may thereafter be required to come in individually and prove the amounts of their respective
claims"); *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006) (pointing out
26  that the advisory committee notes state that a "court may properly [use Rule 23(c)(4)] to separate
the issue of liability and damages").  Here, what is before the Court is something akin to a
27  separation of liability and damages issues – *i.e.*, Ms. Nolen will rely on common evidence to show
that PeopleConnect used people's names and photos for a commercial purpose; if she is
28  successful, then the only remaining step for a person to claim statutory damages of $750 is to
show that their name was readily identifiable.

United States District Court
Northern District of California

1    recording of live performances at numerous events over a period of decades will thus require

2    individualized analysis"); *Alpha Tech Pet, Inc. v. Lagasse, LLC*, No. 16 C 513, 2017 U.S. Dist.

3    LEXIS 182499, at *15-16 (N.D. Ill. Nov. 3, 2017) (in case brought under the Telephone

4    Consumer Protection Act, noting that "[d]efendants have provided evidence that many thousands

5    of potential class members provided a consent form or are shown in the Trend database as having

6    consented"; adding that "defendants have provided the same types of evidence that other courts

7    have looked to when evaluating whether individualized consent issues make class certification

8    inappropriate").

9         However, the issue of consent does not always involves individualized inquiries that defy

10   class treatment.  The Court agrees with the approach of one district court (albeit in a TCPA case):

11

12         A defendant's bare assertion that some of the putative class members
           may have consented does not preclude class certification.  But if the
13         defendant is able to offer some evidence supporting a consent
           defense, especially if the defendant can do so as to a significant
14         number of putative class members, and the plaintiff fails to offer a
           viable class-wide mechanism for resolving the issue, that can
15         preclude certification.

16   *Cooper v. Neilmed Pharms., Inc.*, 342 F.R.D. 240, 247 (S.D. Ohio 2022).

17        As reflected in one of its interrogatory responses, PeopleConnect claims that the issue of

18   consent would lead to individualized inquiries in the instant case because consent could have been

19   given in multiple ways:

20         (1) "Users of Classmates.com provide written consent when they register for an

21             account on Classmates.com" because they agree to the Terms of Service[13];

22   _____

23   [13] A copy of the current Terms of Service can be found at Exhibit 1 to the Toivola Declaration.
     Section 1.B of the Terms of Service provides in relevant part:

24

25         You agree that, in the event you conduct a search for yourself on the
           Websites, you authorize another person to conduct a search for you
26         on the Websites, or another person conducts a search for you on the
           Websites on your behalf or for your benefit, you have expressly
27         consented to the use and display of information about you
           (including, without limitation, your name, image, photo and other
28         attributes of your identity) on the Websites for any and all
           commercial and non-commercial purposes.  You also agree that, in
           the event another person authorizes you to conduct a search for them

                                        27

United States District Court
Northern District of California

(2) "PeopleConnect obtains consent from any person who donates their yearbook(s) by
visiting the yearbook donation webpage on Classmates.com" (this is part of the
Send In Your Yearbook ("SIYY") program);

(3) "[S]tudents and/or their guardians may have provided a blanket consent to their
schools regarding the use of any photographs taken of them including for the
inclusion in a yearbook" and may also have given "a blanket consent directly to the
yearbook publishers in order for their photographs and information to be included
in the yearbook at the time that they sat for yearbook photographs"; and

(4) "Individuals . . . may have consented broadly to the use of their names and/or
photographs through their use of third-party websites."

Osborn Decl., Ex. 10 (response to Interrogatory No. 3).

    a.      Consent Through Agreement to Terms of Service

With respect to (1), Ms. Nolen contends that there is no issue because she has defined the class to *exclude* all registered users – *i.e.*, those who arguably consented by agreeing to the Terms of Service as a part of registration.

PeopleConnect's main response is that determining who is a registered user will involve an individualized inquiry in and of itself – or at least raises questions of whether the class as defined will be manageable. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 n.4, 1127-28 (9th Cir. 2017) (noting that "we have addressed the types of alleged definitional deficiencies other courts have referred to as 'ascertainability' issues through analysis of Rule 23's enumerated requirements" – *e.g.*, predominance and superiority/manageability). This is largely because

on the Websites, or you conduct a search on the Websites on behalf of or for the benefit of another person, you have expressly consented, on that other person's behalf, to the use and display of information about that person (including, without limitation, their name, image, photo and other attributes of their identity) on the Websites for any and all commercial and non-commercial purposes.

Toivola Decl., Ex. 1 (Terms of Service). The Toivola Declaration states: "Since September 1, 2021, the OTS has included a provision stating that users who conduct a search for themselves or authorize another to conduct a search for them on Classmates.com consent to PeopleConnect's use and display of their name and other attributes of their identity."  Toivola Decl. ¶ 4.

28

1   ███████████████████████████████████████████████

2   ██████████████████ Lambard Decl. ¶ 61 **[filed under seal]**. ███████████

3   ████████████████████████████████████████████████

4   ██████████████████ Lambard Decl. ¶ 61 **[filed under seal]**.  PeopleConnect adds that

5   this is not speculation on its part and uses the Tulare Union High School yearbook from 2016 to

6   give some context.

7

8          61.    For example, there are ███████ current Registered Member accounts that identify graduating from Tulare Union High School in 2016. ████████████████ Registered Member accounts

9   (████), however, use names that do not match the names of any names identified in the index of that yearbook.

10

11          62.    Two of those ████████ Registered Member accounts provided the names "████" and "███."  Two others provided the

12   name "Delia Naranjo," which is not a name that appears in the 2016 Tulare Union High School yearbook – though there is a "████

13   ████" and a "████████████."  One registered user provided the name "████████████," but there are three different individuals with

14   that name in this yearbook.  One registered user provided the name "████████████" but that name does not appear in the 2016

15   Tulare Union High School yearbook.  While there is a ████████ ██████ and ████████████, neither are identified as seniors

16   in the yearbook.

17   Lambard Decl. ¶¶ 62-63 **[filed under seal]**.  *But see* Opp'n at 10-11 (asserting that PeopleConnect

18   is wrong in claiming that there are three separate people with the name "Emma Dodson"); Nolen

19   Reply Decl. ¶ 3 ("I recognize Ms. Dodson and I believe the references in the 2016 Tulare Union

20   High School yearbook to Emma Dodson, Emma Claire Dodson, and Emma Clair Dodson all refer

21   to the same person.").

22         PeopleConnect further argues that the Court should not permit people to self-identify (*i.e.*,

23   declare that they are not registered users and thus are a part of the class) because people are prone

24   to make errors.  PeopleConnect points out that former named plaintiffs in this case and in other

25   cases maintained that they were not registered users only to admit otherwise after PeopleConnect

26   did some investigation.  *See* Opp'n at 22 (stating that, in this case, two named plaintiffs withdrew

27   or dismissed their claims (Jamaal Carney and Alexandra Overton); adding that the same happened

28   in cases where PeopleConnect was sued in Washington and Illinois).

In her reply brief, Ms. Nolen does not really dispute PeopleConnect's position that to determine who is a part of the class would depend on:

> (1) a person's self-identification, *see* Reply at 10 (asserting that "Class membership can be established [in part] by the user averring that none of the registered email addresses associated with her yearbook ever belonged to her"), and
>
> (2) a cross-check by PeopleConnect to see if that person is in its database. *See* Reply at 10 (stating that "PeopleConnect [could] check[] the claimant's name, email address and high school against its database") (internal quotation marks omitted).

Ms. Nolen's contention is that the above approach does not lead to significant individualized inquiries or superiority/manageability issues.

Ms. Nolen's position is persuasive. Self-identification of eligibility of class members is not uncommon. Indeed, the Ninth Circuit has expressly allowed for use of self-identification for purposes of class certification. It has explained that concerns about fraud and the due process rights of a defendant are not reasons to reject use of self-identification. For example:

> The fraud concern may be valid in theory, but "in practice, the risk of dilution [*i.e.*, regarding the recovery of legitimate claimants] based on fraudulent or mistaken claims seems low, perhaps to the point of being negligible." This especially true in a class actions involving low-cost consumer goods. Why would a consumer risk perjury charges and spend the time and effort to submit a false claim for a de minimis monetary recovery? And even if consumers might do so, courts "can rely, as they have for decades, on claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court" to avoid of minimize fraudulent claims.

*Briseno*, 844 F.3d at 1129.[14]

As for due process, the Ninth Circuit has noted that "[t]he gravamen of this . . . concern seems to be that defendants must have an opportunity to dispute whether [*e.g.*] class members

---

[14] In the instant case, of course, it should be noted that Ms. Nolen is seeking statutory damages of $750 – not an insignificant amount. *See* Cal. Civ. Code § 3344(a) ("[T]he person who violated the section shall be liable to the injured party or parties in an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered by him or her as a result of the unauthorized use, and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages.").

1   really bought the product or used the service at issue." *Id.* at 1130.  But, the court stated, the

2   defendant could bring challenges to the named plaintiffs as part of class certification or even later

3   in the proceedings; as for absent class members, the defendant could mount challenges "if and

4   when they file claims for damages . . . . Rule 23 specifically contemplates the need for . . .

5   individualized claim determinations after a finding of liability." *Id.* at 1131.  The Ninth Circuit

6   added that,

7

8       [i]f the concern is that claimants in cases like this [*i.e.*, consumer
        cases] will eventually offer only a "self-serving affidavit" as proof

9       of class membership, it is . . . unclear why that issue must be
        resolved at the class certification stage to protect a defendant's due

10      process rights. . . . Given that a consumer's affidavit could force a
        liability determination at trial [in an individual lawsuit] without

11      offending the Due Process Clause, we see no reason to refuse class
        certification simply because that same consumer will present her

12      affidavit in a claims administration process after a liability
        determination has already been made.

13  *Id.* at 1132; *see also Melgar v. CSK Auto, Inc.*, 681 Fed. Appx. 605, 607 (9th Cir. 2017) ("The

14  district court did not abuse its discretion by certifying a class action with a self-certification

15  process.  Our recent decision in *Briseno* . . . controls . . . . *Briseno* rejects [defendant's] due

16  process concern with respect to this case . . . .").

17      The fact that PeopleConnect could test self-identifications by, *e.g.*, sampling provides

18  additional protection for it.  If PeopleConnect were to find significant fraud, then it could always

19  move the Court for decertification if it demonstrates that excessive numbers of individualized

20  inquiries are necessary.

21      PeopleConnect suggests there is the potential for significant fraud based on its evaluation

22  of the 2016 Tulare yearbook discussed above.  *See, e.g.*, Lambard Decl. ¶ 61 ("For example, there

23  are ███████████ Registered Member accounts that identify graduating from Tulare Union

24  High School in 2016.  ████████████████ Registered Member accounts (███),

25  however, use names that do not match the names of any names identified in the index of that

26  yearbook.").  But there may well be innocent explanations for some of the problems identified by

27  PeopleConnect.  For example, there may be discrepancies between registration names and

28  yearbook names because people have changed their names over the years, whether due to marriage

United States District Court
Northern District of California

31

1   or some other circumstance.  The self-identification process could require a person to provide all

2   names used over the years to assist in PeopleConnect's sampling.  PeopleConnect has yet to

3   demonstrate that there is widespread fraud that cannot be simply resolved.

                                                                                       **b.**     <u>Consent Through Donation</u>

4

5   With respect to (2), Ms. Nolen initially argued in her opening brief that consent through

6   donation will not involve an individualized inquiry because every person who donates a yearbook

7   is a registered user and thus has been excluded from the class.  *See* Mot. at 8 n.4 ("[D]onating a

8   yearbook requires creating an account on Classmates.com."); Mot. at 15 n.5 ("[D]onating a

9   yearbook requires creating an account on Classmates.com and agreeing to the Terms of Service.

10  Because the Class excludes account holders, no one who has donated a yearbook is a member of

11  the Class.").

12  In its opposition, PeopleConnect argues that Ms. Nolen is factually wrong.  That is,

13  PeopleConnect represents that donors are not *required* to create an account but rather *can* create

14  an account to become a Free Member.  *See* Lambard Decl. ¶ 16.  PeopleConnect adds that,

15  currently, it "offers SIYY participants a free, time-limited subscription to Classmates+ to thank

16  them for donating or loaning their yearbook(s)," Lambard Decl. ¶ 44; to activate that subscription,

17  a person must register as a Free Member – *i.e.*, create an account with Classmates.com.  *See*

18  Lambard Decl. ¶ 45.  However, as above, nothing *requires* that a donor obtain a subscription in

19  order to donate.

20  PeopleConnect then goes on to argue that "there is no mechanical way" to exclude donors

21  from the class – *e.g.*, "PeopleConnect does not systemically record whether donors appear in the

22  yearbooks they provide," nor does it "verify the accuracy of information provided by donors.

23  Opp'n at 18.

24  In her reply brief, Ms. Nolen modifies the argument made in her opening brief.  She

25  somewhat questions PeopleConnect's claim that donors are not required to register – pointing to

26  the fact that "the yearbook donation form requires the don[or] provide a 'Full name,' 'Address,'

27  'City,' 'State,' 'Zip Code,' 'Phone Number,' and 'Email Address,' along with information about

28  their yearbook."  Reply at 8.  However, she ultimately does not press on PeopleConnect's claim

United States District Court
Northern District of California

32

because she states that she "will exclude yearbook don[ors] from the Class by definition" of the class.  Reply at 8.

PeopleConnect, of course, contends that there is no mechanical way to exclude yearbook donors – *i.e.*, "PeopleConnect does not systemically record whether donors appear in the yearbooks they provide," nor does it "verify the accuracy of information provided by donors." Opp'n at 18.  But this is not a reason to deny class certification.  Similar to above, people can be required to self-identify (*i.e.*, declare that they are not yearbook donors) and PeopleConnect has a means of testing that self-identification based on the donation forms that are filled out by donors.  That people may make donations of yearbooks that they do not appear in is certainly possible, but the self-identification can presumably be worded in such a way to make this situation not a concern (*e.g.*, the self-identification can require a person to certify that they did not donate a yearbook in which they appeared).

        c.    Consent to Third Parties Such as Schools or Yearbook Publishers

Donation as discussed above concerns donations by individuals.  However, PeopleConnect gets donations from not only individuals but also "schools, . . . libraries, museums, bookstore owners, historical societies and others."[15]  Lambard Decl. ¶ 27; *see also* Lambard Decl. ¶¶ 33-41 (providing examples of yearbook donations – *e.g.*, from the widow of a teacher, school administrators, a student council president, a school alumni organization, and a teacher).  PeopleConnect maintains that individuals named or pictured in yearbooks could have given broad

---

[15] "On hundreds of occasions, individual schools or school districts have [also] *sold* one or more yearbooks to PeopleConnect.  When contacting schools, school districts or other sources, PeopleConnect informed the contacted source that the books were being purchased to display on Classmates.com and to facilitate the sale of reprints."  Lambard Decl. ¶ 6 (emphasis added); *see also* Lambard Decl. ¶¶ 46-57 (testifying that "PeopleConnect used to obtain yearbooks pursuant to agreements with ███████████, which People Connect understood primarily solicited yearbooks from schools and libraries for scanning and publication on Classmates.com"; "PeopleConnect believed that ██████ informed the schools and libraries from whom [they] solicited yearbooks that the yearbooks would be published on Classmates.com").

Note that PeopleConnect ██████████████████████████████████ *see* Lambard Decl. ¶ 54 – ████████████████████████████ *See* Lambard Decl. ¶¶ 8-9 (█████████████████████████████████).



*United States District Court*
*Northern District of California*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1 consents to schools, yearbook publishers, or other third parties to use their names, photos,

2 likenesses, etc., which gives rise to more individualized inquiries.  Thus, *e.g.*, if a school was

3 given a broad consent to use, and a school administrator donated a yearbook to PeopleConnect,

4 then PeopleConnect could have been allowed to use the names and/or photos in the yearbook

5 based on the school's permission to use.

6      As an initial matter, the Court takes note that the primary issue here is whether schools

7 were given broad consents.  PeopleConnect has not offered any concrete evidence that yearbook

8 publishers were given broad consents to use.  Nor has it offered any concrete evidence that other

9 third parties were given broad consents to use.  *See, e.g.*, Opp'n at 17 (asserting that "some

10 photographers or yearbook companies *likely* require students to sign consent forms" but not citing

11 any supporting evidence) (emphasis added).

12      Ms. Nolen suggests that consents given to a school should be deemed irrelevant.  "The

13 relevant question under § 3344 is whether *PeopleConnect* obtained Class members' 'prior

14 consent' to make commercial use of their names and photographs, not whether some other 'third-

15 party website' or yearbook publisher did so."  Mot. at 15 (emphasis in original); *see also Fischer*

16 *v. Instant Checkmate LLC*, No. 19 C 4892, 2022 U.S. Dist. LEXIS 59143, at *28 (N.D. Ill. Mar.

17 31. 2022) ("As for consenting to data sharing by non-parties, Instant Checkmate admits in an

18 interrogatory response that its Terms of Use is the sole method by which it received consent from

19 Illinois residents to advertise the availability of their background reports on its website.

20 Accordingly, whatever consent a putative class member gave to a non-party to use or share her

21 identity has no bearing on whether that putative class member consented to Instant Checkmate's

22 use of her identity.").  Ms. Nolen's contention is not without any merit.  But it seems to miss the

23 point being raised by PeopleConnect – *i.e.*, if a school were given a broad consent by the

24 individuals named or pictured in a yearbook, then arguably the school's permission to use

25 insulates PeopleConnect from liability.  The question therefore is whether there is any evidence to

26 support PeopleConnect's position that it would not be unusual for schools to be given broad

27 consents.

28      PeopleConnect has submitted evidence it obtained from school districts regarding use of

United States District Court
Northern District of California

34

student names and photos.  That evidence is attached to the Halbig Declaration.

- Halbig Decl., Ex. 1 (San Diego Unified School District Universal Form) (including a photo/video/media release; providing several options – *e.g.*, permission for child to be "interviewed, photographed, and/or video recorded by the district/school" ("[p]hotos and videos may be used on school district websites, brochures, social media, etc.") and also permission for child's photo to be "included in the school yearbook").

- Halbig Decl., Ex. 2 (Fresno Unified School District Permission to Photograph/Videotape Form) (giving the district the right to take photos or videos of child "in connection with the above-identified subject [subject line left blank]"; authorizing the district as well as "its assignees and transferees" the right "to copyright, use and publish the same in print and/or electronically"; and agreeing that the district may use the photos or videos "for any lawful purpose, including for example such purposes as publicity, illustration advertising, instruction and web content").

- Halbig Decl., Ex. 5 (Fresno Unified School District Annual Parent Student Notification and Consent Form) (including Photo and Media Release Consent Form; providing as one option permission to the district "to photograph by son/daughter for use in any and all district publications").

- Halbig Decl., Ex. 3 (Long Beach Unified School District Student Media Authorization and Release) (granting the district and its assigns permission to use child's image or visual likeness, name, etc. "throughout the world, by incorporating it or them into publications, catalogues, brochures, books, magazines, photo exhibits, motions pictures, videos, web pages, and/or other media or commercial, informational, educational, training, advertising, recruiting or promotional materials relating thereto using any means, method or media which LBUSD deems appropriate in its sole discretion"; agreeing that all rights in the "materials created by LBUSD pursuant to this agreement are the exclusive property of LBUSD and

35

1    that I will obtain no rights in such materials").

2    • Halbig Decl., Ex. 4 (Tulare Joint Union High School District Mandatory Parent or

3    Guardian Response Form) (including Photo/Name Release Agreement that asks for

4    permission "to use your student's photograph, name, and projects or assignments to

5    post on our district or school web sites"; "I hereby consent to allow the [district] to

6    use any photographs taken of me or my class projects or assignments to promote,

7    illustrate or publicize school activities").

8    • Halbig Decl., Ex. 6 (Los Angeles Unified School District Parent/Guardian Publicity

9    Authorization and Release) (giving the option of giving the district "the right to

10   print, photograph, record, and edit as desired, the biographical information, name,

11   image, likeness, and/or voice of the above named pupil on audio, video, film, slide,

12   or any other electronic and printed formats . . . for the purposes stated or related to

13   the above" – *e.g.*, "educational program activities in which your pupil has

14   participated"; "authorization will enable us to . . . (1) train teachers, (2) increase

15   public awareness and promote continuation and improvement of education

16   programs, and/or (3) highlight accomplishments of students and educational

17   programs").

18   • Halbig Decl., Ex. 7 (Villanova Prepatory School Personal Image Consent and

19   Release Agreement) (giving the school and their "successors and assigns . . . the

20   right and permission to photograph, video and record the name, image, likeness and

21   voice of any minor child of mine who participates in SAW [Signed – Anointed – to

22   Witness] at VPS . . . for education, communication, marketing, publicity,

23   advertising, promotional and any other usage").

24       As indicated by the language above, most of the consents are not that broad – *e.g.*, they

25   allow for the district to use the names or photos for district purposes.  At best, only a few of the

26   forms above suggest that there might be broader consents – Exhibits 2, 3, and 7 above since they

27   refer to assignees, transferees, or successors.  Thus, based on the record presented, there may be

28   some individualized inquiries based on consents obtained by schools but there is nothing to

United States District Court
Northern District of California

36

indicate that they would be extensive.  In any event, the issue, if raised by PeopleConnect through

evidence that particular schools have obtained broad consent from all their students, is a matter

that can be resolved on a group basis – school by school rather than person by person.  And

PeopleConnect has yet to demonstrate this is such a widespread practice that this mode of consent

will require such time-consuming determination as to defeat predominance.  Again, should it do

so, it may seek decertification at the appropriate time.

> 4.    Commonality/Predominance: Injury

Ms. Nolen maintains that the commonality/predominance requirements are met for not

only liability but also damages.  Section 3344(a) provides in relevant part as follows:

> Any person who knowingly uses another's name, . . . photograph, or
> likeness, in any manner, on or in products, merchandise, or goods,
> or for purposes of advertising or selling, or soliciting purchases of,
> products, merchandise, goods or services, without such person's
> prior consent . . . shall be liable for any damages sustained by the
> person or persons injured as a result thereof.  In addition, in any
> action brought under this section, the person who violated the
> section shall be liable to the injured party or parties in an amount
> equal to the greater of seven hundred fifty dollars ($750) or the
> actual damages suffered by him or her as a result of the
> unauthorized use, and any profits from the unauthorized use that are
> attributable to the use and are not taken into account in computing
> the actual damages.

Cal. Civ. Code § 3344(a).  Ms. Nolen acknowledges that the statute provides for a plaintiff's

actual damages[16] as well as a defendant's profits based on the use of the plaintiff's identity but

notes that she is limiting her request (and that of the putative class) to statutory damages, which

thereby disposes of any commonality/predominance concerns.

PeopleConnect argues that, even if Ms. Nolen limits the request to statutory damages, that

is not sufficient because, in order to get statutory damages, a person must first be injured.  *See*

---

[16] As the Court indicated in a prior order, actual damages for a noncelebrity plaintiff will often involve mental anguish.  *See Callahan v. PeopleConnect, Inc.*, No. 20-cv-09203 EMC, 2021 U.S. Dist. LEXIS 210857, at *45-46 (N.D. Cal. Nov. 1, 2021) (noting that, "'by enacting section 3344(a), the Legislature provided a practical remedy for a noncelebrity plaintiff whose damages are difficult to prove and who suffers primarily mental harm from the commercial misappropriation of his or her name'").

37

*Callahan*, 2021 U.S. Dist. LEXIS 210857, at *46 (in the case at bar, indicating that, on its face, "§ 3344 does require that a plaintiff have suffered injury in order to be awarded damages, including statutory"); *Lightbourne v. Printroom Inc.*, 307 F.R.D. 593, 602-603 (C.D. Cal. 2015) (noting that, "while Section 3344 of the California Civil Code provides for $750 in statutory damages, courts parsing the statute have unanimously concluded that these statutory damages are recoverable only upon a showing of actual damages, whether they are commercial in nature or stem from a non-celebrity plaintiff's mental anguish"). Thus, Ms. Nolen must show that injury to all class members is susceptible to common proof.

But contrary to what PeopleConnect suggests, Ms. Nolen can assert a claim for injury based on common proof. As Ms. Nolen points out, this Court previously held that, "[i]f a defendant uses a plaintiff's name and/or likeness to advertise, then it can reasonably be inferred that the name and/or likeness has some economic value, even if small." *Callahan*, 2021 U.S. Dist. LEXIS 210857, at *40 (citing cases indicating that even noncelebrities can have economic injury). PeopleConnect suggests that this order should not be given much, if any, weight because it was addressing a 12(b)(6) challenge only. This distinction is inapposite. What is true in the context of the motion to dismiss is true here. Critical to this Court's analysis is the conclusion that economic injury alone, without the need to establish physical or mental injury, is sufficient to recover statutory damages § 3344.

Furthermore, Ms. Nolen credibly contends there is common proof of injury. Specifically, Ms. Nolen argues that people's names and/or photos have some economic value as demonstrated by the following:

(1) "PeopleConnect licenses the yearbooks in the Classmates.com library to certain third parties, such as Ancestry.com," in exchange for a fee. Lambard Decl. ¶ 5.

(2)  Lambard Decl. ¶ 46 **[filed under seal]**.

(3) PeopleConnect previously purchased yearbooks from third parties (*e.g.*, schools,

38

1    individuals, or companies such as ███████████████████). *See* Lambard Decl.

2    ¶ 6 [**filed under seal**].

3    In its papers, PeopleConnect argues that, even if it profited from the use of people's names

4    and/or photos, that does not thereby mean any of those people were injured. *See* Opp'n at 15 ("It

5    is axiomatic that the equitable remedy of disgorgement does not compensate a plaintiff's injury.).

6    But it may reasonably be inferred that, *e.g.*, third parties would not pay PeopleConnect a licensing

7    fee for the yearbooks if they had no value.  More important, PeopleConnect misses the larger point

8    that Ms. Nolen makes: to wit, people's names and images have value as a collection and thus there

9    is value to its essential components, *i.e.*, each name and image.  Hence, all individuals' whose

10    names and images contribute to the value of the collection are deprived of the value of their

11    contribution thereto.[17]

12    5.    Commonality/Predominance: Affirmative Defense Based on the Communications

13    Decency Act

14    PeopleConnect contends that, putting aside Ms. Nolen's case in chief, it has affirmative

15    defenses that require individualized inquiries, thus defeating the commonality and predominance

16    requirements.  The first affirmative defense it focuses on is based on the Communications

17    Decency Act ("CDA").

18    As the Court noted in a prior order,

19

20    the CDA "'protects from liability (1) a provider or user of an
      interactive computer service (2) whom a plaintiff seeks to treat,
21    under a state law cause of action, as a publisher or speaker (3) of
      information provided by another information content provider.'"
22    The third element has two subcomponents: (a) the information at
      issue must come from an "information content provider" and (b) the
23    information must be "provided by" the information contention
      provider.

24

25    _____

26    [17] ███████████████████████████████████████████████ *See*
      Lambard Decl. ¶ 8 ████████████████████████████████████████████
27    ████████████████████████. ███████████████████████████████████, particularly because,
28    *e.g.*, it still licenses the yearbooks to others for a fee.  In other words, yearbooks still have
      economic value, and therefore so do the essential components that make them up.

United States District Court
Northern District of California

*Callahan*, 2021 U.S. Dist. LEXIS 210857, at *15 (emphasis in original).  The Court went on to explain that, under Ninth Circuit precedent,

> "a service provider or user is immunity from liability under [the CDA] when a third person or entity that created or developed the information in question furnished it to the provider or user under circumstances in which a reasonable person in the position of the service provider or user would conclude that the information was provided for publication on the Internet or other 'interactive computer service.'"

*Id.* at *7.

The Court went on to hold that, in the case at bar, there was at the very least

> a question of fact as to whether a reasonable person in the position of PeopleConnect (the service provider) would conclude that the yearbook authors/publishers (the information content providers) intended the yearbooks to be published on the internet.  As Plaintiffs point out, the yearbooks at issue were published in the 1990s and early 2000s when "[t]he Internet was in its infancy and social media did not exist."  Moreover, there is a difference between publishing a yearbook for a school or local community and publishing a yearbook on the internet where the audience is far broader.  Thus, it would be hard to conclude that, as a matter of law, PeopleConnect is a publisher of information provided by another information content provider and is thus entitled to immunity under the CDA.

*Id.* at *18.

In its opposition brief, PeopleConnect seizes on the Court's order, contending that individualized inquiries will be needed to assess the above.  The problem for PeopleConnect is that it ignores the footnote in the same order stating that

> [t]here would also appear to be a question of fact as to whether PeopleConnect should be deemed *a developer of information itself – i.e.*, not just a mere service provider – to the extent it was not simply republishing yearbook photographs and/or information.  *See Knapke*, 2021 U.S. Dist. LEXIS 150249, at *10-11 (holding that PeopleConnect was not protected by CDA immunity because it was the *publisher of its own content in creating an advertisement*); *[c]f. Lukis v. Whitepages, Inc.*, 454 F. Supp. 3d 746, 763 (N.D. Ill. 2020) (stating that, "[i]n the present record, Whitepages did not act as a mere passive transmitter or publisher of information that was 'provided by another information content provider'[;] [r]ather, it is alleged to have actively compiled and collated, from several sources, information regarding Lukis [and therefore] [t]he CDA . . . does not shield Whitepages from liability").

United States District Court
Northern District of California

1    *Id.* at \*20 n.7 (emphasis added). Ms. Nolen intends to challenge CDA immunity under this theory,

2    an issue amenable to classwide treatment.

3            6.      Commonality/Predominance: Affirmative Defense Based on Arbitration and/or

4                    Class Action Waiver

5            The other affirmative defense implicated by PeopleConnect relates to arbitration and/or a

6    class action waiver. PeopleConnect notes that the Terms of Service for Classmates.com includes

7    an arbitration provision and a provision on class action waiver. According to PeopleConnect,

8    individualized inquiries will need to be made to determine whether a given person agreed to

9    arbitrate or waived the right to a class action.

10           In response, Ms. Nolen points out that she has *excluded* from the class all registered users

11   and only registered users could have agreed to the Terms of Service for Classmates.com. This

12   leads to the same issues discussed above – *i.e.*, in conjunction with PeopleConnect's argument that

13   a person who has registered agrees to the Terms of Service and thereby *consents* to the use of her

14   identity.

15   B.      Adequacy/Typicality of Ms. Nolen

16           Although PeopleConnect's main arguments against certification of a Rule 23(b)(3)

17   damages class relate to the commonality/predominance requirements, it has also made some

18   arguments as to whether Ms. Nolen is a typical or adequate class member. According to

19   PeopleConnect, Ms. Nolen is not an adequate or typical class member because (1) she "has a weak

20   case on identifiability" since "[s]he does not appear on any of the full-resolution pages available in

21   Browse View, leaving only her appearances in low-resolution thumbnails as possible bases for her

22   claim"; (2) there is no evidence that anyone has ever searched for her on Classmates.com; and (3)

23   she has not suffered any actual damages and/or does not seek damages. Opp'n at 28-29.

24           None of these arguments is persuasive. For example, the argument in (1) ignores the fact

25   that Ms. Nolen's case is predicated on a search for her name being done, which leads to search

26   results showing not just thumbnail photos but also her name, her school, and the yearbook year.

27   On (2), there is no viewership requirement as the Court has previously held, and PeopleConnect

28   agreed at the hearing that the issue was whether a person was "searchable," not whether they had

United States District Court
Northern District of California

41

1   actually been "searched."  Finally, on (3), PeopleConnect is correct that, in her deposition, Ms.

2   Nolen primarily discussed mental anguish as her injury but she has now, for purposes of class

3   certification, disavowed seeking damages based on mental anguish.  That being said, in her

4   deposition, Ms. Nolen did not – as PeopleConnect suggests – state that she suffered no other

5   injury.  She testified, *inter alia*, that she was not sure whether she lost any money as a result of

6   PeopleConnect's conduct; that she believed her "pictures and information [were] my property";

7   and that she was not sure how much that property was worth.  Halbig Decl., Ex. 8 (Nolen Depo. at

8   199-200).  That is sufficient to state a claim of economic injury supportive of statutory damages

9   under § 3344 as discussed above.

10  C.    <u>Superiority</u>

11        As indicated above, superiority is required for a damages class to be certified under Rule

12  23(b)(3).  *See* Fed. R. Civ. P. 23(b)(3) (requiring a finding that "a class action is superior to other

13  available methods for fairly and efficiently adjudicating the controversy").  This is necessarily a

14  comparative inquiry.  *See Briseno*, 844 F.3d at 1128 ("Rule 23(b)(3) calls for a comparative

15  assessment of the costs and benefits of class adjudication, including the availability of 'other

16  methods' for resolving the controversy.").  One consideration for a court in determining whether a

17  class action is superior to other methods of adjudicating a controversy is "the likely difficulties in

18  managing a class action." Fed. R. Civ. P. 23(b)(3)(D).  Although PeopleConnect makes several

19  arguments on manageability, most replicate arguments made above.  *See* Opp'n at 25 (arguing

20  that, because the predominance requirement is not met, the superiority requirement is likewise not

21  met; also, there is "no feasible way to determine how to identify let alone exclude Registered

22  [Users] who are by definition not class members").

23        The only new argument offered by PeopleConnect is that "there is no manageable way to

24  limit the class only to individuals who reside in California."  Opp'n at 24.  But self-identification

25  is one way to identify California residents.  Furthermore, if there are concerns about whether

26  someone resides in California, there may be ways to confirm residency without a great deal of

27  difficulty (*e.g.*, running a name against an address).

28

42

1  D.  Summary

2      For the reasons stated above, PeopleConnect's arguments largely lack merit.  The Court

3  grants certification of a Rule 23(b)(3) class but conditioned on a modified class definition – (1)

4  clarifying that it is a person's name that is searchable (although PeopleConnect's use could be

5  either a person's name or name in conjunction with photo) and (2) providing that donors who

6  donated their own yearbooks are excluded from the class.

7                    **IV.      RULE 23(B)(2) CLASS**

8      Because the Court certifies a Rule 23(b)(3) damages class, it follows that certification of a

9  Rule 23(b)(2) injunctive relief class is appropriate as well.

10                    **V.       CONCLUSION**

11      For the foregoing reasons, the Court conditionally grants Ms. Nolen's motion for class

12  certification.  The grant is conditioned on her modification of the class definition.  To avoid

13  further disputes, the Court orders the parties to meet and confer to see if they reach agreement on a

14  modified class definition (reserving to PeopleConnect the right to appeal this class certification

15  order).  The Court also orders the parties to meet and confer to see if they can reach agreement on

16  a class notice plan and language to be used in a class notice.

17      Within four weeks from the date of this order, the parties shall file a joint status report

18  addressing (1) the class definition; (2) the class notice plan; and (3) the language to be used in the

19  class notice.

20  ///

21

22

23

24

25

26

27

28

*United States District Court*
*Northern District of California*

43

1-ER-53

Finally, the Court notes that, out of an abundance of caution, it is sealing the entirety of this order because PeopleConnect will likely contend that some of the information at issue is confidential.  The Court orders the parties to meet and confer to see if they can reach agreement on what needs to be sealed, bearing in mind that a request to seal should be narrowly tailored.  Within a week of the date of this order, the parties shall file a joint stipulation on sealing and provide a proposed redacted version of this order to be publicly filed.

This order disposes of Docket No. 190.

**IT IS SO ORDERED**.

Dated: December 14, 2023

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

44

1-ER-54